**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

FEIVEL GOTTLIEB RESTATED DEFINED
BENEFIT TRUST, Individually and On
Behalf of All Others Similarly Situated,

        Plaintiff,

vs.

JOHN J. RIGAS, MICHAEL J. RIGAS,
TIMOTHY J. RIGAS, and JAMES P. RIGAS,

        Defendants.

---

Civil Action No.

**CLASS ACTION COMPLAINT**
**FOR VIOLATION OF**
**FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## NATURE OF THE ACTION

Plaintiff, individually and on behalf of all others similarly situated, by and through his

attorneys, alleges the following on information and belief, except as to allegations concerning his

own actions, based upon an investigation made by and through his counsel.

1.      This is a securities fraud class action brought on behalf of all purchasers of the

securities of Adelphia Business Solutions, Inc. ("Adelphia Solutions" or the "Company")

between January 6, 2000 and March 27, 2002, inclusive, (the "Class Period") for violations of the

Securities Exchange Act of 1934 (the "Exchange Act").

2.      Adelphia Solutions is a Delaware corporation with offices located at One North

Main Street, Coudersport, Pennsylvania.  Prior to January 11, 2002, the Company was a majority

(79%) owned subsidiary of Adelphia Communications Corporation ("Adelphia

Communications").  On January 11, 2002, Adelphia Communications distributed all of its shares

of Adelphia Solutions stock to the shareholders of Adelphia Communications.  As a result, the

Rigas Defendants collectively obtained a direct majority ownership of Adelphia Solutions.

3.      Adelphia Solutions provides integrated telecommunications services to businesses, governmental and educational customers.  On March 27, 2002, Adelphia Solutions filed for Chapter 11 Bankruptcy and thus cannot be named as a defendant in this action.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. §78aa.

5.      This action arises under § 10(b) and § 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t( a), and SEC Rule 10b-5 promulgated thereunder, 17 C. F. R. § 240.10b-5.

6.      Venue is proper in this district pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/ or its effects have occurred within this district and Defendants conduct substantial business in this District.

7.      In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.      Plaintiff Feivel Gottlieb Restated Defined Benefit Trust purchased Adelphia Solutions securities during the Class Period as set forth in the accompanying Certification which is incorporated herein by reference, and was damaged thereby.

9.      The Defendants (collectively, the "Rigas Defendants"), at all times relevant to this action, are believed to have served in the capacities listed below and to have received substantial

2

compensation:

(a)     Defendant John Rigas was Chairman of the Board of Directors of Adelphia
Solutions until his resignation on May 15, 2002.  John Rigas is also the founder and was, until
his resignation, Chief Executive Officer of Adelphia Communications.  John Rigas owns or
controls over 74% of the Class B common stock of Adelphia Communications.  As of April 1,
2001, John Rigas owned or controlled approximately 649,500 shares of Adelphia Solutions Class
A common stock.  John Rigas is the father of Defendants Michael J. Rigas, Timothy J. Rigas,
and James P. Rigas.

(b)     Defendant Michael J. Rigas is Vice Chairman, Secretary, and a Director of
Adelphia Solutions.  Michael Rigas also served as Executive Vice President, Operations, and a
Director of Adelphia Communications.  As of April 1, 2001, Michael J. Rigas owned or
controlled approximately 53.7% shares of the outstanding Class B common stock of Adelphia
Communications and 602,500 shares of Class A common stock of Adelphia Solutions.

(c)     Timothy J. Rigas was Vice Chairman, Chief Financial Officer, Chief Accounting
Officer, and Treasurer of Adelphia Solutions until his resignation on May 16, 2002.  Timothy J.
Rigas was also Executive Vice President, Chief Financial Officer, Chief Accounting Officer and
Treasurer of Adelphia Communications.  As of April 1, 2001, Timothy J. Rigas owned or
controlled more than 53% of the outstanding Class B common stock of Adelphia
Communications and 592,500 shares of Class A common stock of Adelphia Solutions.

(d)     James P. Rigas is Vice Chairman, Chief Executive Officer, President, and a
Director of Adelphia, Solutions.  James Rigas also served as Executive Vice President, Strategic
Planning of Adelphia Communications.  As of April 1, 2001, James P. Rigas owned or controlled

more than 49% of the outstanding Class B common stock of Adelphia Communications and 642,500 shares of the Class A common stock of Adelphia Solutions.

10.     The Defendants were the senior officers and/or directors of Adelphia Solutions. Defendants were also controlling stockholders of Adelphia Solutions whether (i) by their majority ownership interest in Adelphia Communications prior to the distribution of Adelphia Communications' ownership interest in Adelphia Solutions or (ii) as majority stockholders of Adelphia Solutions after the distribution of Adelphia Communications' interest.  Thus, Defendants were controlling persons of the Company.  In addition, the Defendants had the power and influence, and exercised such power and influence, to cause Adelphia Solutions to engage in the unlawful practices complained of herein.  Because of their executive, managerial and/or directorial positions with Adelphia Solutions and Adelphia Communications, the Defendants had access to the adverse, non-public information about the business, finances, strategy and future business prospects of Adelphia Solutions as particularized herein and acted to misrepresent, misstate or conceal such information from Plaintiff, other members of the Class (as described herein), and the investing public.

11.     The Defendants participated in the wrongdoing complained of herein in order to, among other things:

(a)     inflate and maintain the price of the securities of the Company and of Adelphia Communications;

(b)     protect and enhance their position as officers and/or directors of Adelphia Communications and Adelphia Solutions and the substantial compensation and prestige they obtained thereby;

(c)    enhance the value of their personal holdings of Adelphia Communications and

Adelphia Solutions securities and permit them to purchase additional common stock and

maintain adequate margin levels; and

(d)    misstate Adelphia Solutions' assets, revenues and earnings in order to inflate the

price of Adelphia Solutions and Adelphia Communications securities.

12.    Each of the Defendants is liable as a participant in a fraudulent scheme and course

of business that operated and continues to operate as a fraud or deceit on purchasers of Adelphia

Solutions securities, by disseminating materially false and misleading statements and/or

concealing material adverse facts. The ongoing scheme:

(a)    deceived the investing public regarding the business, finances and value of

Adelphia Solutions' assets and securities; and

(b)    caused Plaintiff and other members of the Class (as described herein) to purchase

Adelphia Solutions securities at artificially inflated prices.

13.    Each of the Defendants knew of and recklessly disregarded the fact that the illegal

acts and practices and misleading statements and omissions described herein would adversely

affect the integrity of the market for Adelphia Solutions securities and would artificially inflate or

maintain the price of those securities.  Each of the Defendants, by acting as herein described, did

so knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff and

other members of the Class that Plaintiff seeks to represent.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23( a) and (b)( 3) on behalf of a class, consisting of all persons who purchased or

otherwise acquired Adelphia Solutions securities between January 6, 2000 and March 27, 2002,

inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are

Defendants, members of each of the immediate families, any subsidiary or affiliate of Adelphia

Communications or Adelphia Solutions and the directors and officers of Adelphia

Communications or Adelphia Solutions or their subsidiaries or affiliates, or any entity in which

any excluded person has a controlling interest, and the legal representatives, heirs, successors and

assigns of any excluded person.

15.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are

thousands of members of the Class located throughout the United States. As of November 9,

2001, there were approximately 47.7 million shares of Adelphia Solutions Class A common

stock and approximately 86.7 million shares of Adelphia Communications Class B common

stock outstanding. Throughout the Class Period, Adelphia Communications securities were

actively traded on the national securities exchanges. Record owners and other members of the

Class may be identified from records maintained by Adelphia Solutions and/or its transfer agents

and may be notified of the pendency of this action by mail, using a form of notice similar to that

customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the other members of the Class as all

members of the Class were similarly affected by Defendants' wrongful conduct in violation of

federal laws complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)    whether documents, press releases, SEC filings and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, financial condition, assets and prospects of Adelphia Solutions;

(d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, performance and prospects of Adelphia Solutions;

(e)    whether the market price of Adelphia Solutions securities during the Class Period was artificially inflated due to the material misrepresentations and omissions of material facts complained of herein; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

7

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.    Artificial Inflation of Line Counts

20.    During the Class Period, Defendants portrayed Adelphia Solutions as a growing telecommunications business. Among other things, the market viewed the number of new customers that Adelphia Solutions assigned to its available telecommunications lines in its various regions of service as indicative of the Company's growth. These "line counts" were important statistics reflecting the new business and growth of the Company. Likewise, the amount of customers who retained their lines (*i.e.*, they did not terminate or disconnect service) was significant in arriving at a net line count (*i.e.*, new lines minus terminated/disconnected lines) for Adelphia Solutions.

21.    The Defendants sought to emphasize Adelphia Solutions' growth by publicizing the Company's line count statistics. However, the Defendants knew or were deliberately reckless in disregarding that the levels of Adelphia Solutions' line counts being publicly reported were grossly overstated because of the following widespread practices at the Company that were either instituted or condoned by Defendants:

(a)    Adding hundreds of lines to existing customers who never ordered them and disconnecting the lines within the same month without reporting the disconnect/ termination. This practice, known as "cramming," artificially inflated Adelphia Solutions' reported line counts. Customers were usually unaware of the additional lines because, since the service was

terminated in the same month, they were never billed.  This practice resulted in Adelphia

Solutions' artificially inflated line counts.

(b)    The names of businesses were entered into the system as "new customers" even

though the businesses had never signed up for service with Adelphia Solutions.  Adelphia

Solutions would then either disconnect the lines in the same month without reporting the

disconnection or simply throw away the bills.  This practice, known as "slamming," added to the

inflated line counts publicly reported by Defendants.

(c)    Businesses with bad credit histories with other telecommunications companies or

with Adelphia Solutions were entered as "new lines" when the businesses had not ordered new

service or were known to be unable to pay for new service.

(d)    Adelphia Solutions customers who had disconnected all or a portion of their lines

were still being retained on Adelphia Solutions systems as customers and being billed for the

disconnected lines.  However, bills for these disconnected lines were destroyed.

22.    While these practices were prevalent throughout Adelphia Solutions, its Louisville

and Philadelphia offices were noteworthy for their inflated levels of line counts.  As an indication

of the pervasiveness of this "line count inflation," in approximately April 2001, the Company's

Philadelphia office received a legitimate line order that it could not fill because the system

reported an insufficient number of lines/ports available to fill this large order.  However, many of

those lines were actually being improperly reported as active because of the foregoing practices

to deceptively inflate Adelphia Solutions' line counts.

23.    The Defendants encouraged the improper sales and accounting practices described

above.  At least as early as November, 2000, personnel in the operations unit responsible for

billing Adelphia Solutions customers, located in West Seneca, New York, notified the corporate

accounting department as well as the Company's top executives that the line counts being

reported to the public in multiple locations had been inaccurate and grossly overstated for many

months.  Theses employees were told that the Adelphia Solutions Senior Leadership Team would

take care of the issue and that they should not discuss the issue with anyone.

Defendants' False And Misleading Statements Regarding Line Counts

24.    On January 6, 2000, the Rigas Defendants caused Adelphia Solutions to issue a

press release announcing that the Company estimated it had:

> sold approximately 87,570 new access lines and installed
> approximately 80,200 new access lines during the fourth quarter
> ended December 31, 1999.  For the year ended  December 31,
> 1999, the Company estimates that it has sold approximately
> 221,000 new access lines.  As of December 31, 1999, the Company
> estimates that its has a total of approximately 331,000 access lines
> installed, of which approximately 55% were provisioned on its
> own network (on-switch).

25.    In each of Adelphia Solutions' quarterly reports on Form 10-Q during the Class

Period, the Rigas Defendants continued to cause Adelphia Solutions to report false and

misleading line counts as follows:

| New Lines Sold | New Lines  Installed | Time Period | Source (date) |
|---|---|---|---|
| 87,570 | 80,202 | Quarter ending December 31, 1999 | 10-K (March 30, (2000) |
| 72,572 | 81,165 | Quarter ending March 31, 2000 | Press Release (May 9, 2000) |
| 72,268 | 81,460 | Quarter ending June 30, 2000 | Press Release (August 9, 2000) |

103,139              83,225              Quarter ending September 30, 2000 Press Release
                                                              (November 9, 2000)

26.    At year end 2000, Defendants were forced to begin addressing some of the

accounting problems created by their false and deceptive sales and line count practices.

Specifically, for the quarter ending December 31, 2000, Defendants caused Adelphia Solutions to

take a charge of $15 million for "potentially uncollectible accounts receivable associated

primarily with Internet service providers."  However, given the Defendants' false sales and billing

practices, it is clear that this provision was an effort to begin to address the undisclosed improper

sales and billing practices of the Company.  No disclosure was made during the Class Period of

the false sales practice or of the total effect of the sales' practices on Adelphia Solutions business.

Instead, Defendants concealed that many of the "lines" connected to Adelphia Solutions' system

were the result of slamming or cramming or other improper sales practices.  Throughout the

Class Period, Defendants failed to disclose the impact of their deceptive sales practices of

Adelphia Solutions reported level of line counts and its business in general.

**B.    Commitments to Adelphia Communications' Corporate Overhead**

27.    Defendants caused Adelphia Solutions to enter into various agreements with

Adelphia Communications pursuant to which Adelphia Solutions would be obligated under

certain circumstances to make payments to Adelphia Communications.  In addition, Defendants

obligated Adelphia Solutions to share corporate overhead services and other business expenses

and services with Adelphia Communications.  However, class members were not informed that

these payments to Adelphia Communications and sharing of corporate expenses were handled in

a completely arbitrary manner at the whim of the Rigas Defendants and without regard to the

actual expenses incurred by Adelphia Solutions.  Rather, the Rigas Defendants arbitrarily decided

based on the financial needs of any one or more of the many companies under the control of the

Rigas Defendants as to how to allocate expenses and payment obligations among the many

companies owned by the Rigas family.

28.     Despite their personal direction of the labyrinth of companies in the Rigas family

empire, the Rigas Defendants misleadingly caused Adelphia Solutions to represent to investors

that its corporate overhead expenses were allocated with some reasonable relationship to

Adelphia Solutions' actual usage of overhead services.

<u>Defendants' False and Misleading Statements Regarding Corporate Overhead</u>

29.     The proxy statement issued by Adelphia Solutions on July 7, 2000, stated:

> During the year ended December 31, 1999, the Company made
> demand advances to Adelphia periodically, for which the Company
> earned interest at 5.15%, totaling approximately $8.5 million.
> During the period January 1, 1999 to December 31, 1999, the
> largest amount due from Adelphia Communications at the end of
> any quarter was approximately $392.6 million at December 31,
> 1999.
>
> The Company and Adelphia Communications have entered into a
> registration rights agreement, as amended, whereby the Company
> has agreed to provide to Adelphia Communications and certain
> permitted transferees, with respect to common stock owned by
> them, two demand registration rights per year under certain
> conditions, including that any such demand be with respect to
> shares with a minimum of $10 million in market value, and with
> certain piggyback registration rights in future public offerings of
> the common stock.  Adelphia Communications' demand
> registration rights terminate at such time as Adelphia
> Communications creases to hold at least $10 million in market
> value of common stock.
>
> During the year ended December 31, 1999, the Company incurred
> charges from Adelphia Communications of approximately $8.6

million for the provision to the Company to shared corporate overhead services in areas such as personnel payroll, management information services, computer services, shared use of office, aircraft and network facilities and support equipment. The Company expects that shares for the provision of similar services by Adelphia Communications to the Company, or by the Company to Adelphia Communications will continue to be incurred or charged by these services have been based on allocation of Adelphia Communications' incremental costs incurred for these services, and do not necessarily represent the actual costs that would be incurred if the Company was to secure such services on its own or the Management Services Agreement between the Company and Adelphia Communications dated April 10, 1998, with respect to shared corporate overhead service. During the year ended December 31, 1999, the Company (i) paid Adelphia Communications or certain of Adelphia Communications' affiliates, fiber lease payments of approximately $0.2 million, (ii) received from Adelphia Communications $1.8 million in revenue for providing switched services, and (iii) paid to entities owned by members of the Rigas family who are executive officers of the Company approximately $1.6 million for property, plant and equipment and services.

30.    Defendants falsely and misleadingly referred to the overhead expenses in Adelphia Solutions other public filings as "corporate overhead." The levels of "corporate overhead" reported by Defendants in Adelphia Solutions' public filings were as follows:

| Amount of Corporate Overhead | Source |
|---|---|
| $15.9 million | Form 10-Q (filed May 15, 2000) |
| $14.1 million | Form 10-Q filed August 14, 2000) |
| $23.7 million | Form 10-K (filed April 2, 2001) |
| $17.2 million | Form 10-Q (filed August 14, 2001) |
| $14.8 million | Form 10-Q (filed November 13, 2001) |

31.    The proxy statement and Adelphia Solutions' other public filings identified in paragraph 30 herein were false and misleading in that they violated generally accepted accounting principles ("GAAP"). Adelphia Solutions did not properly account for its corporate

overhead expenses paid to Adelphia Communications.  Among other things, Adelphia Solutions engaged in the following practices:

(a)    Adelphia Solutions and Adelphia Communications failed to properly document labor, operating, equipment, circuit network and other costs to the appropriate legal entities. Where employees worked in part for Adelphia Solutions, their time was not fully or accurately charged/recorded to Adelphia Solutions;

(b)    Software applications licensed from Remedy, Microsoft, Veritas and Oracle have been provided by Adelphia Communications to Adelphia Solutions with no or inadequate accounting and licensing documentation, including proper notice to the manufacturer;

(c)    Hardware and network circuits have been used and routed to Adelphia Solutions from Adelphia Communications or other entities with no or inadequate accounting documentation;

(d)    Office space (rooms, etc.) were utilized by Adelphia Solutions in Coudersport, Pennsylvania in buildings or spaces shared with Adelphia Communications without any or with inadequate documentation and accounting; and (e) Powerlink network sales, support, accounting and provisioning services were shared with Adelphia Communications with no or inadequate accounting documentation.

C.    **Adelphia Communications' Off-balance Sheet Liabilities**

32.    Throughout the Class Period, Adelphia Communications' debt was understated because the Rigas Defendants omitted material off-balance sheet liabilities for which they and Adelphia Communications were co-liable.  The Rigas Defendants and Adelphia Communications had entered into agreements with entities controlled by the Rigas Defendants pursuant to which

14

Adelphia Communications guaranteed certain loans, in excess of $2 billion. Adelphia Solutions, because of its heavy dependence on the Rigas Defendants and Adelphia Communications, was materially impacted by these off-balance sheet liabilities and they should have been publicly disclosed to Adelphia Solutions investors.

Defendants' False and Misleading Statements Regarding Off-Balance Sheet Liabilities

33.    Defendants' public statements did not disclose these off-balance sheet liabilities. For example, in Adelphia Solutions' proxy statement, issued on July 6, 2001, Defendants caused Adelphia Solutions to state:

> The Company and certain of Adelphia Communications' other subsidiaries and affiliates are parties to a joint bank credit facility. As part of this facility, the Company and its subsidiaries have the ability to borrow up to an aggregate of $500.0 million which, if borrowed, would be guaranteed by other members of the borrowing group. As of December 31, 2000, a subsidiary of the Company had borrowed $500.0 million under this credit facility. In addition, the Company has agreed to pay a subsidiary of Adelphia $15.0 million as a fee for placing the credit facility. The interest rate at which the Company has borrowed these funds is 12 1/2%, a portion of which is payable to a subsidiary of Adelphia. For the year ended December 31, 2000, the Company recorded $21.9 million for interest expense relating to the credit facility, $7.0 million of which was payable to a subsidiary of Adelphia.

Given this heavy dependence on Adelphia Communications, the off-balance sheet liabilities of Adelphia Communications were material to the ability of Adelphia Solutions to maintain its sources of financing.

34.    The proxy statement and Defendants 10-Q's and 10-K's filed during the Class Period identified in paragraph 30 herein were false and misleading and violated GAAP because they failed to disclose the off-balance sheet liabilities of Adelphia Communications and their

impact on Adelphia Solutions.

**The Truth Emerges**

35.     On March 1, 2002, Adelphia Solutions announced that it would not make an interest payment of $15.3 million on certain secured notes of the Company and that it, therefore, would be in default of the notes.

36.     On March 27, 2002, Adelphia Communications announced its results for the fourth quarter for the year ended December 31, 2001. In the press release, the footnote disclosures for the financial statements noted the following:

> Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas family and managed by the Company ("Managed Entities") for borrowing amounts of up to $5,630,000[,000]. Each of the co-borrowers is liable for all borrowing under the credit facilities and may borrow up to the full amount of the facilities. Amounts borrowed under these facilities by the Company's subsidiaries are included as debt in the Company's consolidated balance sheet. Amounts borrowed by Managed Entities under the facilities are not included on the Company's consolidated balance sheet. ... As of December 31, 2001, co-borrowing credit facilities balances, net of amount otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately $2,284,000[,000].

37.     In a conference call following the announcement of financial results, Adelphia Communications announced that it had entered into these off-balance sheet financing arrangements which obligated Adelphia Communications for approximately $2.3 billion in debts, together with an entity controlled by the Rigas family.

38.     That entity, Highland Holdings (the "Partnership"), was a closely held partnership controlled by the Rigas Defendants which had borrowed money against the credit facilities. It was further disclosed that Highland Holdings did not have sufficient assets to cover the debts

16

which would obligate Adelphia Communications to pay any outstanding amounts. The $2.3 billion amount was eventually raised to $2.7 billion as Adelphia Communications made further disclosures about its liabilities. In addition, it was eventually disclosed that half of the Rigas Defendants' $650 million Adelphia Communications stake was pledged against margin.

39.    On the same day, March 27, Adelphia Solutions announced that it had filed for Chapter 11 Bankruptcy protection.

40.    On May 2, 2002, Adelphia Communications further disclosed that it would likely restate Adelphia Communications' borrowings in its financial statements to increase them by $1.6 billion, as of December 31, 2001; $1.2 billion as of December 31, 2000; and $700 million as of December 31, 1999.

<u>Defendants' Responsibility For Internal Controls And For Financial Reporting</u>

41.    Defendants had the responsibility to maintain sufficient controls to accurately report Adelphia Solutions' results. The representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management.

42.    According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a company must establish an internal control structure. Pursuant to §13( b)( 2) of the Exchange Act, Adelphia Solutions was required to:

> [M]ake and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (A) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (1) transactions are executed in accordance with management's general or specific authorization; (ii) transactions

17

are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles....

43.    To accomplish the objectives of accurately recording, processing, summarizing and reporting data, a company must establish an internal control structure. In the structure, according to Appendix D to Statement on Auditing Standards No. 55, <u>Consideration of the Internal Control Structure in a Financial Statement Audit</u> ("SAS 55"), management should consider, among other things, such objectives as (i) making certain that "[t]ransactions are recorded as necessary ... to permit presentation of financial statements in conformity with generally accepted accounting principles. ... and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

44.    According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. ... to provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

AU §319A.13.

45.    Adelphia Solutions had repeatedly represented to investors the adequacy and strength of its internal control systems. However, Adelphia Solutions' lack of internal controls and procedures were deficient in having the process or procedures to review and approve related party transactions including its overhead expenses.

46.    Contrary to the requirements of GAAP and SEC rules, Adelphia Solutions failed to implement and maintain an adequate internal accounting control system. Defendants, acting

18

as Adelphia Solutions' management, knowingly tolerated the existence of inadequate internal

controls and/or recklessly disregarded its obligation to implement adequate controls to ensure

that overhead expenses and revenues were properly recorded in compliance with GAAP.

47.     Further, the undisclosed adverse information concealed by Defendants during the

Class Period is the type of information which, because of SEC regulations, regulations of the

national stock exchanges, and customary business practice, is expected by investors and

securities analysts to be disclosed and is known by corporate officials and their legal and

financial advisors to be the type of information that is expected to be and must be disclosed.

## FRAUD ON THE MARKET DOCTRINE

48.     The market for Adelphia Solutions securities was open, well-developed and

efficient at all relevant times.  As a result of the Defendants' materially false and misleading

statements and failure to disclose, Adelphia Solutions securities traded at artificially inflated

prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise

acquired Adelphia Solutions securities relying upon the integrity of the market price of Adelphia

Solutions securities and market information relating to Adelphia Solutions and have been

damaged thereby.

49.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Adelphia Solutions securities, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make Defendants'

statements, as set forth herein, not false and misleading.  These statements and omissions were

materially false and misleading in that they failed to disclose material information and

misrepresented the truth about the Company, its business, finances and operations, as further set

forth above.

50.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were substantial contributing causes of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made materially false or misleading statements about Adelphia Solutions' business, finances and operations.  These material misstatements and omissions have the cause and effect of creating in the market an unrealistically positive assessment of Adelphia Solutions and its business, finances and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at an artificially inflated price, thus causing the damages complained of herein.

51.    At all relevant times, the market for Adelphia Solutions securities was an efficient market for the following reasons, among others:

(a)    Adelphia Solutions securities met the requirements for listing, and was listed and actively traded on the NASDAQ, an efficient market;

(b)    As a regulated issuer, Adelphia Solutions filed periodic public reports with the SEC;

(c)    Adelphia Solutions regularly issued press releases which were carried by national news wires;

(d)    Throughout the Class Period, Defendants actively solicited press coverage and attention from securities brokerage firms and distributed, or caused to be distributed, information

and reports to shareholders, securities firms, analysts and customers; and

(e)    Throughout the Class Period, it is believed that the Rigas Defendants met with representatives of securities firms, investors and potential investors, including shareholders, and continuously disseminated false statements about the strength and potential of Adelphia Solutions' business, which statements were relied upon by the investing public.

52.    As planned, Defendants' positive statements and false financial statements and false projections of their expected financial performance continued to support and increased the price of the Company's securities.

53.    As a result, the market for Adelphia Solutions securities promptly digested ongoing information with respect to Adelphia Solutions from all available sources and reflected such information in Adelphia Solutions' securities prices. The analysts and securities firms with whom Defendants met also provided such information about Adelphia Solutions into the markets.  Under these circumstances, all purchasers of Adelphia Solutions securities during the Class Period suffered similar injury due to their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## SCIENTER ALLEGATIONS

54.    As alleged herein, Defendants acted with scienter in that the Rigas Defendants knew that the public statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein, the

21

Rigas Defendants, by virtue of their receipt of information reflecting the true facts regarding

Adelphia Solutions, Adelphia Communications, and their business practices, their control over

and/or receipt of Adelphia Solutions' and Adelphia Communications' allegedly materially

misleading misstatements, and/or their associations with the Company and Adelphia

Communications which made them privy to confidential or proprietary information concerning

Adelphia Solutions and Adelphia Communications, were active and culpable participants in the

fraudulent scheme alleged herein.  Defendants were the senior executives and directors of

Adelphia Solutions and Adelphia Communications and knew of their actions in running

Adelphia Communications and Adelphia Solutions for their own personal benefit.  The false and

misleading nature of the material facts alleged herein which the Rigas Defendants caused to be

disseminated to the investing public, personally benefitted the Rigas Defendants. The ongoing

fraudulent scheme described in this Complaint could not have been perpetrated without the

knowledge and complicity of the Rigas Defendants.

    55.    The Defendants engaged in a scheme to inflate the price of Adelphia Solutions

securities in order to: (a) protect and enhance their executive positions and the substantial

compensation and prestige they obtained thereby; (b) enhance the value of their substantial

personal holdings of Adelphia Communications; and (c) prevent the public from learning of their

improper acts concerning the operations of Adelphia Communications and Adelphia Solutions

for their own personal benefit.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Violations of Section 10( b) Of The Exchange Act And SEC Rule 10b-5**
**(Against All Defendants)**

    56.    Plaintiff repeats and realleges the allegations set forth in ¶¶1-55 above.  This

22

Claim is asserted against all Defendants.

57.     Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about Adelphia Solutions' financial condition, assets, results and related party transactions; and (b) participated in drafting, reviewing and/ or approving the misleading statements, releases, reports and other public representations of and about Adelphia Solutions' business and finances.

58.     During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified herein, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to made the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10( b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Adelphia Solutions securities during the Class Period.

60.     Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Adelphia Solutions securities.  Plaintiff and the Class would not have purchased Adelphia Solutions securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(1)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

(2)    Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(3)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(4)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  July 8, 2002                     Respectfully submitted:

**BERGER & MONTAGUE, P.C.**


By: _____
         Sherrie R. Savett
         Robin Switzenbaum
         1622 Locust Street
         Philadelphia, Pennsylvania  19103-6365
         (215) 875-3000
         (215) 875-4604 (fax)

         Counsel for Plaintiff

Of Counsel:

HAROLD B. OBSTFELD, P.C.
Harold B. Obstfeld
260 Madison Avenue
New York, New York 10016
(212) 696-1212

BEATIE AND OSBORN LLP
Edward Korsinsky, Esq.
521 Fifth Avenue
New York, New York  10175
Telephone:  (212) 888-9000

352499.wpd